**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PAUL HAMILTON,**

                                    **Plaintiff,**

            **v.**                                              **9:04-CV-1282**
                                                                **(FJS/DEP)**

**WARREN BARKLEY, Superintendent;**
**CAPTAIN CRAWFORD; and MR. SHANNON,**
**Nurse Administrator,**

                              **Defendants.**

_____

**APPEARANCES**                              **OF COUNSEL**

**OFFICE OF ANTHONY C. OFODILE**             **ANTHONY C. OFODILE, ESQ.**
498 Atlantic Avenue
Brooklyn, New York 11217
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                   **SENTA B. SIUDA, AAG**
**STATE ATTORNEY GENERAL**
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204-2455
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        Currently before the Court is Defendants' motion for summary judgment.  In support of

their motion, Defendants assert that (1) Defendant Barkley was not personally involved in the

alleged violations of Plaintiff's constitutional rights, (2) they did not violate Plaintiff's due

process rights, and (3) they are entitled to qualified immunity.

## II. BACKGROUND

**A.    Procedural background**

Plaintiff filed his original *pro se* complaint in this case on November 4, 2004.  *See* Dkt.

No. 1.  On November 15, 2006, the Court entered a judgment in this case, dismissing the

complaint for Plaintiff's failure to prosecute and his failure to notify the Court of his change in

address.  *See* Dkt. No. 19.

Plaintiff's current counsel entered his appearance on behalf of Plaintiff on January 8,

2007.  *See* Dkt. No. 22.  On November 14, 2007, Plaintiff moved to reopen this case.  *See* Dkt.

No. 23.  Defendants opposed that motion.  *See* Dkt. No. 25.  This Court granted the motion on

February 19, 2008.  *See* Dkt. No. 27.

Plaintiff then moved to amend his complaint on April 7, 2008.  *See* Dkt. No. 28.

Defendants opposed that motion.  *See* Dkt. No. 31.  By Order dated June 17, 2008, the Court

granted the motion in part and denied the motion in part.  *See* Dkt. No. 33.  Plaintiff filed his

amended complaint on July 9, 2008.  *See* Dkt. No. 35.


**B.    Factual background**

Plaintiff alleges that, on December 29, 2003, while incarcerated at Cape Vincent

Correctional Facility, he was required to give a urine sample for a urinalysis test.  *See* Amended

Complaint at ¶ 10.  Plaintiff asserts that he was unable to give the sample "because the

medications he was taking for his HIV-positive condition often prevented him from urinating

without moving his bowels first and he was not able to move his bowels within the time

allotted."  *See id.*

Plaintiff was issued a misbehavior report for his failure to give a urine sample. On December 31, 2003, Defendant Crawford, the hearing officer, commenced the Tier III hearing regarding this misbehavior report. *See id.* at ¶ 12. Plaintiff requested Dr. Moehs as a medical witness. *See id.* Plaintiff explained to Defendant Crawford how the medications he was taking had prevented him from providing a urine sample within the time allotted and that Dr. Moehs was willing to testify on his behalf and could testify about how Plaintiff's medications prevented him from providing the urine sample. *See id.* at ¶ 13. At that point, Defendant Crawford adjourned the hearing to January 8, 2004, and told Plaintiff, on the record, that he was doing so in order that he could make arrangements for Dr. Moehs to testify. *See id.*

On January 8, 2004, Defendant Crawford "insinuated to Plaintiff that Dr. Moehs was not going to be available, even though Dr. Moehs was at work on that day and had expressed to Plaintiff that he was ready and willing to testify for Plaintiff." *See id.* at ¶ 14. Defendant Crawford told Plaintiff that Defendant Shannon, the Nurse Administrator, could testify about the effects of the medication, that Dr. Moehs was not needed, and that he would adjourn the hearing and try to arrange for Defendant Shannon to come to the hearing rather than trying to have Dr. Moehs testify. *See id.*

On January 12, 2004, the hearing reconvened, and Defendant Shannon testified. *See id.* at ¶ 15. Plaintiff alleges that Defendant Shannon

> intentionally misrepresented the content of Plaintiff's medical records and Plaintiff's condition . . . [and that he] falsely represented that he had the ability to correctly opine on Plaintiff's condition and the effect that the medications had on Plaintiff, while knowing that . . . he had insufficient or non-existent knowledge of the effect that the medications [had] on Plaintiff, that he hadn't treated Plaintiff, and that he had no personal knowledge of

-3-

Plaintiff's condition.

*See id.*

Plaintiff again requested that Dr. Moehs testify, and Defendant Crawford refused that request. *See id.* At the end of the hearing when Defendant Crawford asked Plaintiff if he had any procedural objections to the manner in which the hearing was held, Plaintiff indicated on the record that he objected to Dr. Moehs not being called to testify. *See id.*

After the hearing, Defendant Crawford found Plaintiff guilty of a Urinalysis Testing Violation and sentenced him to six months in the Special Housing Unit ("SHU"), twelve months loss of packages, loss of commissary, and loss of phone, and recommended a twelve-month loss of good time. *See id.* at ¶ 16. Plaintiff appealed that decision to Defendant Superintendent Barkley. *See id.* at ¶ 17. In February 2004, Plaintiff received a letter from Defendant Barkley upholding the Tier III hearing decision. *See id.*

In a March 12, 2004 decision, the Department of Corrections reversed the Tier III determination. *See id.* at ¶ 18. Plaintiff remained confined in the SHU for approximately one week after receiving the Tier III appeal decision. *See id.* By the time the reversal was implemented, Plaintiff had spent eighty-five days in SHU, where he was only allowed one hour of recreation a day, was not allowed to shower as often as other inmates, was not allowed to receive packages, go to the commissary or use the phone, and could not attend special events, among other things. *See id.*

At the time that he received his disciplinary sentence, Plaintiff was enrolled in the Alcohol and Substance Abuse Treatment Program ("ASAT"), which he was required to complete before being released from prison. *See id.* at ¶ 19. The disciplinary sentence interrupted

Plaintiff's participation in the ASAT Program because he was not allowed to participate in that Program while he was in SHU.  *See id.*  Since Plaintiff could not continue with the ASAT Program, he was required to begin the program anew after the sentence was lifted and had to wait a long time for readmission.  *See id.*  As a result, Plaintiff spent eighteen extra months in jail. *See id.*

Based on these factual allegations, Plaintiff asserts one cause of action, in which he claims that he

> spent approximately 85 days in the Special Housing Unit where his conditions of detention were much worse than his conditions of detention in the general population (as detailed above), spent extra eighteen months in jail, and was subject to atypical and significant hardship in violation of his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and his right not to be subjected to cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution. . . .

*See* Amended Complaint at ¶ 29.

Plaintiff contends that "Defendant Captain Crawford perpetrated these violations . . . by depriving Plaintiff of the only witness whom Plaintiff had requested to be called and who would have explained why Plaintiff was not able to urinate within the time allotted for providing a urine sample – Dr. Moehs."  *See id.* at ¶ 30.  He further claims that

> Defendant Nurse Administrator Larry Shannon perpetrated these violations . . . by intentionally misrepresenting the content of Plaintiff's medical records and Plaintiff's condition and falsely representing that he had the ability to correctly opine on Plaintiff's condition and the effect that the medications had on Plaintiff, while knowing that he was not a medical doctor, that he had insufficient or non-existent knowledge of the effect that the medications [sic] on Plaintiff, that he hadn't treated Plaintiff, and that he had no personal knowledge of Plaintiff's condition.

*See id.*

Finally, Plaintiff asserts that "Defendant Superintendent Warren Barkley perpetrated these violations by failing to consult with Dr. Moehs in considering Plaintiff's appeal of the Tier III hearing decision and failing to overturn the disciplinary sentence despite being made aware of the due process violations."  *See id.*


### III. DISCUSSION

**A.    Preliminary matter**

Defendants note that, in paragraph 19 of his amended complaint, Plaintiff mentions that the disciplinary hearing decision affected the duration of his confinement in prison.  *See* Amended Complaint at ¶ 19.  Defendants assert that, to the extent that the Court considers this statement to be an allegation that Defendants' actions resulted in the extension of Plaintiff's confinement, they are entitled to summary judgment.  *See* Defendants' Memorandum of Law at 12.

Plaintiff argues that his removal from the ASAT Program, as a result of his placement in SHU, affected the duration of his sentence and is part of the equation that the Court should consider in determining whether he had a protected liberty interest under the due process clause. *See* Plaintiff's Memorandum of Law at 9.  Plaintiff notes that, although he is not making a separate claim based on his removal from the ASAT Program, a few courts have held that inmates have a constitutionally protected liberty interest with respect to removal from New York's Temporary Release Programs.  *See id.* at 9-10 (citations omitted).

In *Thompson v. LaClair*, No. 9:08-CV-37, 2008 WL 191212 (N.D.N.Y. Jan. 22, 2008),

this Court addressed a similar issue.  In *Thompson*, the plaintiff alleged that, because he spent

thirty days in the SHU as a result of his disciplinary infraction, he lost the five-and-one-half

months of credit he earned while he was enrolled in the ASAT Program and was not able to

complete that program.  *See id.* at *2.  The plaintiff also contended that his failure to complete

the ASAT Program could result in the denial of parole.  *See id.*  The court noted that the plaintiff

could be contending either that his removal from the ASAT Program deprived him of a liberty

interest or that the potential for denial of parole due to his failure to complete the ASAT Program

amounted to a deprivation of a liberty interest.  *See id.* at *4.  The court noted, however, that

"[i]nmates . . . do not have a constitutional right to be released on parole or to participate in

prison programs."  *Id.* (citations omitted).  Therefore, the court held that, because "an essential

element of a § 1983 claim is that 'the conduct complained of must have deprived a person of

rights, privileges, or immunities secured by the Constitution or laws of the United States,' . . . any

due process challenge grounded in either of these theories fails to state an actionable claim under

42 U.S.C. § 1983."  *Id.* (quotation omitted).

     *Thompson* is dispositive of this issue.  Plaintiff has no liberty interest in participating in

the ASAT Program or in parole.  Therefore, the Court grants Defendants' motion for summary

judgment insofar as Plaintiff bases his due process claim on his removal from the ASAT

Program or the effect that his removal from that program had on the denial of parole.


**B.**    **Summary judgment standard**

     Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine dispute about any material fact to be decided with respect to any essential element of the claim at issue; failure to meet this burden warrants denial of the motion. *See id.* at 250 n.4.  If the moving party meets its initial burden, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.

Finally, when deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences from the facts in a light most favorable to the nonmoving party.  *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005); *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250 (holding that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

**C.    Plaintiff's due process claim**

*1. Liberty interest*

A prisoner has "'no right to due process [at his hearing] *unless* a liberty interest' was infringed as a result." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)).  Furthermore, an inmate's "liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life . . . .'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)) (other citation omitted).  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Id.* (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

It is well-established in this Circuit "'that duration is not the only relevant factor.  The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of "atypical and severe hardship . . . ."'" *Id.* (quoting *Ortiz v. McBride*, 323 F.3d 191, 195 (2d Cir. 2003) (per curiam)).  "'Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.'" *Id.* (quoting *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999)).

Furthermore, "[w]here the plaintiff was confined for an intermediate duration – between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement

relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64-65 (citations omitted).

In such situations, "a district court 'must make a fact-intensive inquiry,' *Sims*, 230 F.3d at 22,

examining 'the actual circumstances of SHU confinement' in the case before it without relying on

its familiarity with SHU conditions in previous cases, *Kalwasinski v. Morse*, 201 F.3d 103, 106

(2d Cir. 1999) (per curiam)." *Id.* at 65.

Moreover, "although shorter confinements under normal SHU conditions may not

implicate a prisoner's liberty interest, *see Sealey*, 197 F.3d at 589, [the Second Circuit] has

explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and

significant hardships if the conditions were more severe than the normal SHU conditions of

*Sealey* or a more fully developed record showed that even relatively brief confinements under

normal SHU conditions were, in fact, atypical . . . ." *Palmer*, 364 F.3d at 65 (citations omitted).[1]

Under the normal conditions of SHU confinement in New York, the inmate is

> "placed in a solitary confinement cell, kept in his cell for 23 hours
> a day, permitted to exercise in the prison yard for one hour a day,
> limited to two showers a week, and denied various privileges
> available to general population prisoners, such as the opportunity to
> work and obtain out-of-cell schooling.  Visitors [are] permitted, but
> the frequency and duration [is] less than in general population.  The
> number of books allowed in the cell [is] also limited."

*Id.* at 65 n.3 (quoting *Colon*, 215 F.3d at 230) (other citations omitted).

---

[1] The Second Circuit noted in *Palmer* that,

> [i]n the absence of a detailed factual record, [it had] affirmed
> dismissal of due process claims only in cases where the period of
> time spent in SHU was exceedingly short – less than the 30 days
> that the *Sandin* plaintiff spent in SHU – and there was no
> indication that the plaintiff endured unusual SHU conditions.

*Palmer*, 364 F.3d at 66 (citations omitted).

In this case, at his deposition, Plaintiff testified that the conditions in SHU at Cape Vincent Correctional Facility, where he was housed for twenty days, included the following: (1) he was confined to his cell twenty-three hours a day; (2) he had one hour of recreation in an area that he walked to; (3) he ate in his cell; (4) he got two, five-minute showers per week; (5) he did not have commissary or telephone privileges; (6) he was not allowed to use weights or play sports; (7) he could not attend special events; and (8) he was permitted visitors, although he did not have any during the time he was in SHU. *See* Transcript of Deposition of Paul Hamilton dated June 27, 2008 ("Pl. Tr."), at 30-38.

Plaintiff also testified that, because he was required to spend more than six months in SHU, he was transferred to Gouverneur Correctional Facility, where he was placed in "S Block" for approximately sixty days, during which time he was double-bunked. Plaintiff further testified that, while confined to SHU at Gouverneur Correctional Facility, the conditions included the following: (1) he was confined to his cell for twenty-three hours a day; (2) he had one hour of recreation in an area attached to his cell, which was a caged two-by-four outdoor area; (3) everything was inside the cell – the shower, the rec, the bathroom; (4) there was no privacy; (5) he had to do everything in front of his bunk mate; and (6) he had to take two-to-four minute showers in a shower that automatically shut off so that if he overslept he did not get a shower. *See id.*

In contrast, Plaintiff testified that, had he been in general population, he could have obtained packaged food and drink from the commissary, he could have used weights and played sports during recreation, he could have attended special events, and he could have taken a nice, long, one-half hour shower with a lot of water. *See id.* He also alleged in his amended complaint

that he would not have been double-bunked and the toilet would not have been in his cell had he

been in general population.  *See* Amended Complaint at ¶ 22.  Moreover, he asserted that the

heating system in SHU was far inferior to that in general population.  *See id.* at ¶ 24.  Finally,

Plaintiff contended that, when he was living in general population at Cape Vincent Correctional

Facility,

> he was free to move around all day, watch TV whenever he
> wanted, go to the law library, go to commissary, decide what to eat
> and when to eat it, go to the kitchen and cook and eat his own food
> which he did often because of his condition and not rely on prison
> food, wash his own clothes, shower every day, use the phones, etc.

*See id.* at ¶ 25.

In *Palmer*, the plaintiff averred that he was subjected to the following conditions for the

seventy-seven days that he spent in SHU:

> deprived [of] his property, [i.e.,] personal clothing, grooming
> equipment, hyg[i]ene products and materials, reading materials,
> writing materials, school books, personal food and vitamin
> supplements, family pictures as well as personal correspondences,
> being mechanically restrained whenever this plaintiff was escorted,
> and being out of communication from his family.

*Palmer*, 364 F.3d at 66.

The court found that the plaintiff's uncontroverted affidavit "raise[d] genuine questions of

material fact as to the conditions under which [the plaintiff] was confined and how those

conditions compared to the conditions imposed on the general prison population."  *Id.* (citing

*Welch*, 196 F.3d at 394).  The court further stated that it agreed

> with the district court that, at least based on the record as it stands
> now, "[the plaintiff] should have the opportunity to demonstrate
> that the conditions of his confinement vis-a-vis both the conditions
> in administrative confinement and in the general prison population

-12-

were sufficiently harsh" to violate a liberty interest despite the
"comparative shortness" of his confinement.

*Id.* (quotation omitted).

Likewise, in this case, Plaintiff's deposition testimony about the conditions of his

confinement in SHU at Cape Vincent Correctional Facility and in S Block at Gouverneur

Correctional Facility raises an issue of fact about how these conditions compare to the conditions

imposed on the general prison population. Therefore, the Court concludes that, based on the

current record, and in light of the Second Circuit's decision in *Palmer*, Plaintiff should have the

opportunity to demonstrate that the conditions of his SHU confinement were sufficiently harsh to

violate a liberty interest even though he was confined in SHU for a comparatively short time.

### 2. Due process at the Tier III hearing

"[D]ue process requires that in a disciplinary hearing resulting in imposition of loss of

good time credits or solitary confinement, an inmate must be afforded advance written notice of

the charges against him and a written statement of fact findings supporting the disposition and

reasons for the disciplinary action taken." *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir.

1999) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-64, 94 S. Ct. 2963, 41 L. Ed. 2d 935

(1974)). In addition, "[s]ubject to legitimate safety and correctional goals of the institution, an

inmate should . . . be permitted to call witnesses and present documentary evidence." *Id.*

(citation omitted). Finally, "an inmate facing SHU confinement . . . has a right to a fair and

impartial hearing officer." *Id.* (citing *McCann v. Coughlin*, 698 F.2d 112, 121-22 (2d Cir.

1983)).

Plaintiff claims that Defendant Crawford's refusal to allow him to call Dr. Moehs as a witness deprived him of the due process to which he was entitled. Pursuant to DOCS regulations,

> [t]he inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.

N.Y. Comp. Codes R. & Regs. tit. 7 § 253.5(a).

"[T]he inmate's right to call witnesses has been characterized by the Second Circuit as mandatory, subject only to 'the narrow exception . . . [for] the unusual situation where allowing an inmate to call a witness would jeopardize institutional safety.'" *Pino v. Dalsheim*, 605 F. Supp. 1305, 1314 (S.D.N.Y. 1984) (quoting [*McCann*, 698 F.2d] at 123) (footnote omitted).[2]

The only reason that Defendant Crawford provided to Plaintiff for not calling Dr. Moehs

---

[2] In *Pino*, the court noted that

> [i]t is inconceivable . . . that defendants continue to insist that the law was unclear in 1981 concerning an inmate's right to call witnesses. To the contrary, as the court noted in *McCann*, the inmate's right to call witnesses was established in this Circuit as far back as 1979. *See McCann*, 798 F.2d at 124-25. Moreover, to the extent there may have existed even the slightest doubt in 1979 concerning the witness requirement, this Court's decision in *Powell v. Ward*, 487 F. Supp. 917 (S.D.N.Y. 1980), *aff'd*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S. Ct. 131, 70 L. Ed. 2d 111 (1981), clearly put the Department of Corrections on notice of the mandatory nature of the constitutional requirement. *See* 487 F. Supp. at 928.

*Pino*, 605 F. Supp. at 1314 n.9.

-14-

as a witness as Plaintiff requested was that Dr. Moehs was not available. However, there is some

question about whether Defendant Crawford ever checked to see if Dr. Moehs was, in fact,

unavailable to testify.

The transcript of the Tier III hearing shows that, on the first day of the hearing after

Plaintiff asked to have Dr. Moehs as a witness, Defendant Crawford adjourned the hearing "until

at which time I can make arrangements for Dr. Moehs to testify." *See* Transcript of Plaintiff's

Tier III Hearing ("Hearing Tr.") at 2. When he reconvened the hearing several days later,

Defendant Crawford stated, "Ok. well I'm not sure Dr. Moehs is going to be availabel [sic] but ah

the nurse administrator definitely will be available." *See id.* at 3. Defendant Crawford then

adjourned the hearing until "someone from the medical department can testify." *See id.* at 6.

When Defendant Crawford reconvened the hearing, Defendant Shannon, the Nurse

Administrator, was present to testify. Plaintiff told Defendant Crawford, once again, that Dr.

Moehs had told him to put him down as a witness. *See id.* at 7. Defendant Crawford responded,

"Ok. unfortunately Dr. Meohs [sic] isn't here today . . . and we have to get this this [sic] done

today." *See id.*

After Defendant Shannon testified, Defendant Crawford stated,

> This is a witness interview notice cause you did ask for Dr. Moehs,
> however, Dr. Moehs is unavailable . . . Explanation [for denial of
> Plaintiff's request to have Dr. Moehs testify] Dr. Moehs is not
> available to testify. Hearing Officer used Nurse Administrator to
> review medical files and testify to medications and their cause and
> effect in [Plaintiff's] medical condition that might prevent him
> from providing the urine sample and the hearing officer is satisfied
> with ah the Nurse Administrator as being a witness and providing
> that documentation or that testimony.

*See id.* at 9.

-15-

Plaintiff responded, "[T]his testimony here I really want give – the medication –. But it does give you diarrhea. the medication –. That's why I really strongly wish that Dr. Moehs was here because he knew the situation. That's what he told me himself that you know put him down as my witness –." *See id.* Furthermore, when Defendant Crawford asked Plaintiff if he had "any procedural objections to the way this hearing is being held," Plaintiff responded, "Yes sir, the only objection that I really have is I wish Dr. Moehs was here. –" *See id.* at 10.

At his deposition, Defendant Crawford testified that he knew that Plaintiff had a right to call Dr. Moehs as a witness. *See* Transcript of Deposition of Dan Crawford dated July 16, 2008 ("Crawford Tr."), at 14. When asked why he did not call Dr. Moehs as a witness, Defendant Crawford responded,

> Looking through the transcript, to the best of my recollection the day I tried to get Dr. Moehs he was busy and unable to testify. When I went back to do the hearing, I had a timeline to finish the hearing by and Dr. Moehs was unavailable. He wasn't there at work. As a hearing officer, I felt the part of the evidence that I needed was someone to explain to me through [Plaintiff's] medical records whether or not he could provide a urine sample. That's all I needed as a hearing officer.

*See id.* at 14-15.

Finally, Defendant Crawford stated that he did not recall whether he called the hospital and asked what days and hours Dr. Moehs worked, although that would have been his usual practice. *See id.* at 16.

At his deposition, Dr. Moehs testified that he told Plaintiff that he

> would testify for him if he wanted and would indicate that medication would cause, could cause diarrhea and that often when people have bowel movements, that they urinate at the same time and so that he might have difficulty. I could understand that he

might have difficulty providing a sample, and I would testify to
that.

*See* Transcript of Deposition of Charles Moehs, M.D. dated July 16, 2008 ("Moehs Tr."), at 16-
17.

He also testified that he did not recall whether anyone had called him to testify. *See id.* at
17-18. Furthermore, he stated that he had been called before to testify for inmates and that he
had never refused. *See id.* at 18. Finally, he stated that he did not recall ever speaking to
Defendant Crawford about Plaintiff's hearing. *See id.* at 21.

Defendants provide no reasonable explanation for Defendant Crawford's decision not to
call Dr. Moehs as a witness. Relying on Magistrate Judge Peebles' decision in *Tapp v. Tougas*,
9:05-CV-1479, Dkt. No. 62 (Report and Recommendation dated August 11, 2008), Defendants
argue that "[P]laintiff requested Dr. Moehs testify as to medical information and the hearing
officer called Nurse Administrator Shannon to testify about medical information. Simply
because [P]laintiff is unhappy with N.A. Shannon's testimony does not mean [P]laintiff was not
provided with 'all of the witnesses necessary to present a meaningful defense to the charges.'"
*See* Defendants' Memorandum of Law at 11 (citation omitted).

Defendants' reliance on *Tapp* is misplaced. The facts in that case are significantly
different than the facts in this case, and Magistrate Judge Peebles' conclusion in *Tapp* that the
record showed "that the plaintiff was permitted to call all of the witnesses necessary to present a
meaningful defense to the charges," *see Tapp*, 9:05-CV-1479, Dkt. No. 62 at 32, is not
dispositive of this case. In *Tapp*, the inmate requested the presence of four inmate witnesses, one
of whom refused to testify, after which the Plaintiff told the hearing officer that he did not want
to pursue securing testimony from that witness. The remaining three witnesses testified at the

hearing.  Subsequently, the inmate wanted to call twelve additional witnesses; the hearing officer allowed him to select four.  When those four were contacted, all of them refused to testify.  The plaintiff subsequently told the hearing officer that he did not find it necessary to call other witnesses because all of them would have repeated versions of events that he and the other witnesses had already provided.  Furthermore, the hearing officer allowed the plaintiff to elicit further testimony from two corrections officers.

Clearly, the situation in *Tapp* is very different from the situation in this case, where Plaintiff only requested that Defendant Crawford call one witness to testify on Plaintiff's behalf. There is nothing in the record to indicate that Dr. Moehs' testimony would have been redundant of the testimony that Defendant Shannon provided, and there is no dispute that Dr. Moehs treated Plaintiff and that he had told Plaintiff that he would testify on his behalf.  Based on these facts, the Court concludes that Defendant Crawford violated Plaintiff's due process rights when he refused to call Dr. Moehs to testify on Plaintiff's behalf.[3]

### D.    Personal liability

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)) (other citations omitted).  "'[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior.'"  *Richardson v.*

---

[3] This assumes, of course, that Plaintiff is able to prove at trial that the conditions of his SHU confinement implicated a protected liberty interest.

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam) (quotation omitted). "To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations. . . . By the same token, however, mere 'linkage in the prison chain of command' is insufficient to implicate a . . . [supervisor] in a § 1983 claim. . . ." *Id.* (internal citations omitted). Finally, a plaintiff can demonstrate that a supervisor is liable under § 1983 in several ways, including that, after learning about the violation through a report or an appeal, he failed to remedy that wrong. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citation omitted).

### 1. Defendant Barkley

In his complaint, Plaintiff states that he appealed the hearing decision to Defendant Barkley and that Defendant Barkley told him that he would look into the matter and forward the appeal to Albany. *See* Amended Complaint at ¶ 17. Plaintiff also asserts that, in February 2004, after he was transferred to Gouverneur Correctional Facility, he received a letter from Defendant Barkley stating that he had reviewed the Tier III hearing records and was upholding the decision. *See id.*

When asked at his deposition if he had any type of review of a Tier III determination, Defendant Barkley testified that he had "[c]ursory review, just to look it over and make sure the disposition is within the guidelines; those types of things." *See* Transcript of Deposition of Warren Barkley dated July 16, 2008 ("Barkley Tr."), at 9. He also testified that he had the authority to overturn Tier III determinations but that he had never done so. *See id.* Defendant Barkley further stated that, although he could not state that his office did not receive Plaintiff's

letter complaining about the hearing determination, he did not recall either receiving that letter or responding to it. *See id.* at 11-12. However, he did state that he would have been the one in the office who would have responded to such a letter. *See id.* at 12.

In *Williams*, the plaintiff claimed that the superintendent of the facility in which he was incarcerated was personally involved in depriving him of his due process right to call witnesses at a disciplinary hearing. The superintendent's only involvement in that deprivation was that his affirmance of the hearing result on appeal. The court found that, at the summary judgment stage, this level of involvement was sufficient to hold the superintendent personally liable even in light of the Superintendent's statement that he had not personally participated in any of the events described in the complaint. *See Williams*, 781 F.2d at 324.

Based on Defendant Barkley's testimony that he reviews Tier III determinations in a cursory manner and that he has never overturned a Tier III determination, the Court assumes that he affirmed Plaintiff's Tier III determination. Therefore, the Court finds that Defendant Barkley's affirmance of Defendant Crawford's Tier III determination is sufficient, at this stage of the litigation, to hold him personally liable for the alleged violation of Plaintiff's due process rights. Accordingly, the Court denies Defendants' motion for summary judgment on this ground.

### 2. Defendant Shannon

Plaintiff has failed to provide any evidence, or even to allege a plausible claim, that Defendant Shannon was personally involved in the alleged violation of Plaintiff's right to due process. Plaintiff's only allegation against Defendant Shannon – which is unsupported by any record evidence – is that he "lied" when he testified at the Tier III hearing. Such a conclusory

allegation is insufficient to demonstrate personal involvement.  Furthermore, Defendant Shannon

had nothing to do with Defendant Crawford's determination regarding Plaintiff's punishment for

failing to provide a urine sample.  Therefore, the Court finds that Plaintiff has failed to establish

Defendant Shannon's personal involvement in the alleged violation of his constitutional rights

and grants Defendants' motion for summary judgment with respect to Plaintiff's claim against

Defendant Shannon.


E.    **Qualified immunity**

The Court has determined that Plaintiff has raised an issue of fact about whether or not

his conditions of confinement meet the *Sandin* atypicality standard and has found that, assuming

that Plaintiff is able to prove at trial that the conditions of his SHU confinement implicate a

protected liberty interest, Defendants violated his right to due process at the Tier III hearing by

not allowing him to call Dr. Moehs as a witness.  As the court noted in *Pino*, "[i]t is

inconceivable . . . that defendants continue to insist that the law [is] unclear . . . concerning an

inmate's right to call witnesses.  To the contrary, . . . the inmate's right to call witnesses was

established in this Circuit as far back as 1979."  *Pino*, 605 F. Supp. at 1314 n.9.  Furthermore, the

Second Circuit has characterized this right "as mandatory, subject only to 'the narrow exception .

. . [for] the unusual situation where allowing an inmate to call a witness would jeopardize

institutional safety.'"  *Id.* (quotation omitted).  Therefore, because issues of fact remain with

regard to one element of Plaintiff's due process claim and Plaintiff has demonstrated that

Defendants deprived him of a clearly established right to call witnesses at a Tier III hearing, the

Court finds that Defendants are not entitled to qualified immunity with respect to Plaintiff's due

process claim.

## IV. CONCLUSION

After carefully reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Plaintiff's due process claim is **DISMISSED** against Defendant Shannon for lack of personal involvement; and the Court further

**ORDERS** that Plaintiff's counsel shall initiate a telephone conference, using a professional conferencing service, with the Court and opposing counsel on at **9:30 a.m.** on **October 9, 2009**, to schedule the trial of this matter.

**IT IS SO ORDERED.**

Dated: September 30, 2009
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

-22-